223 So.2d 912 (1969)
Charles DAVIS, Individually and on Behalf of his Minor Children, Charles Davis, Jr. and Jerry Davis
v.
ROYAL-GLOBE INSURANCE COMPANIES and Louis C. Philips.
No. 3485.
Court of Appeal of Louisiana, Fourth Circuit.
June 2, 1969.
Rehearing Denied July 7, 1969.
*913 Stringer, Manning & St. Pee, James O. Manning, New Orleans, for Charles Davis, plaintiff-appellee.
Bernard, Micholet & Cassisa, Paul V. Cassisa, New Orleans, for Globe Indemnity Co., and Louis C. Philips, defendants-appellants.
Before CHASEZ, HALL and LeSUEUR, JJ.
CHASEZ, Judge.
This is an action for personal injuries suffered by the minors Charles Davis, Jr. and Jerry Davis, allegedly resulting from the ingestion of paint flakes which had fallen from the inside of the apartment in which they had been living. The defendants in this suit are Louis C. Philips, the owner and landlord of the premises, and his insurer, Globe Indemnity Company, erroneously identified as Royal-Globe Insurance Companies in plaintiff's petition. After trial by jury judgment was returned in favor of the children in the amount of $115,000.00 for Charles Davis, Jr. and $2,500.00 for Jerry Davis. Defendants have taken this appeal.
Defendants filed the peremptory exception of no cause of action in the trial court; this exception was considered and overruled below. Defendants have reurged this exception in their appeal, thus we find initially we are relegated to a consideration of this exception herein.
The petition filed in behalf of the minor children, initiating the suit alleges that on or about May 13, 1964 the minor children Charles Davis, Jr. and Jerry Davis, then age three and two respectively, became *914 violently ill while playing in their home. They were taken to a local hospital where their illness was diagnosed as acute lead poisoning.
The petition further averred that the defendant, Louis C. Philips, the owner and landlord of the premises in which the children became ill, was negligent in failing to keep the premises in repair, specifically in that he allowed the apartment to deteriorate into such a rundown condition that the paint began to flake and fall from the walls and ceilings to the floor, and that as a result of this negligence the children living in the apartment had occasion to eat paint flakes on the floor, causing the lead poisoning which resulted in serious and permanent injuries.
Defendants contend that even accepting these facts as established, which they strenuously deny, no cause of action has been shown for which relief can be granted. They argue that a landlord cannot be held for injuries to the children of his tenants, when these injuries are a result of an unusual and extraordinary use of the premises which the landlord could not reasonably foresee. In support of this argument the defendants rely heavily on the recent case of Montgomery v. Cantelli, 174 So.2d 238, La.App. 4 Cir. 1965, (Writ denied) of this Circuit. The facts of that case are somewhat similar to those before us herein. There a three year old child picked off and ate dry and flaky paint from the outside of the front door of the leased premises. As a result of this action the child contracted lead poisoning.
We made these statements in maintaining defendant's no cause of action exception:
"We are convinced that the defendant was not at fault in merely permitting dry or flaky paint to remain on the front door of the premises. Obviously, it would be too great a burden to impose upon a lessor, that is, the obligation of maintaining the exterior of his property so as to avoid the occurrence thereon of dry or checked paint, particularly when we consider the nature of the climate which prevails in this vicinity. We are equally convinced that the defendant herein could not have reasonably foreseen that a child would pick paint flakes from the door and eat them.
"In view of what we have said hereinabove, we are of the opinion that the petition does not disclose a cause of action against the defendants predicated on an accusation of negligence.
* * * * * *
It is equally clear that a lessor is not an insurer of the safety of his tenants. His liability may not be extended so as to include damages for injuries resulting from an abnormal and unexpected use of the property. If that portion of the premises causing the injury would be safe if used in the manner in which the lessor is entitled to assume it will be utilized, he may not be held liable for injuries incurred by an unreasonable or extraordinary use thereof.
"To reiterate, it is abundantly clear that the defendant cannot be made to respond in damages for the injuries sustained by the Montgomery child. It would be ludicrous to expect the lessor to protect the lessee or any member of his family from injuries incurred as a result of eating a portion of the premises. Such gastronomic culinary impulses are, to say the least, abnormal and unexpected, and could not reasonably be anticipated by the lessor. Therefore, we are led to the inevitable conclusion that the defendant is not liable for the very unusual injury incurred by the plaintiff's child."
It is argued on behalf of the minor children however that the Montgomery decision does not control the instant situation. The basis presented for distinguishing this case centers on the fact that in the present case the young children picked up and ate paint flakes from the floor of the inside of the rented premises. The mother of *915 the children, Pauline Davis, testified the paint began to peel and fall from the walls and ceiling a short time after she moved into the apartment in December of 1963. She stated she notified the landlord's resident manager on the premises about this condition several times but no effort was made to correct it. She stated she noticed her children eating the fallen flakes on two or three occasions and each time she stopped them from doing so.
In Acosta v. Irdank Realty Corp., 38 Misc.2d 859, 238 N.Y.S.2d 713, a child suffered lead poisoning from ingesting, over a period of months, paint and plaster which had peeled from the inside walls and ceilings of her parents' leased apartment. The Court found in that case that the owner of the multiple dwelling apartment in which the incident occurred had violated the local law by failing to keep his premises in proper repair, and the injury to the child was a foreseeable consequence of that violation, thus he was liable in damages to the child and her parents.
The Court made these observations in granting judgment for the plaintiff:
"Was this occurrence reasonably foreseeable within the meaning of the law? The defendant takes the position that it was not.
"That small children go around the house picking up everything within their reach and placing it in their months and attempting to eat it is well known. They often have a craving to put in their mouths and eat most unusual things. It would not be unreasonable, therefore, to foresee that Yvette would pick up pieces of plaster and paint if they were lying around and eat them. On the other hand, it is well known that paint contains lead which may cause lead poisoning to anyone ingesting it."
In another case dealing with somewhat the same circumstances, with the exception that the eaten plaster originated not within the tenant's apartment itself but rather in a common hallway which serviced the apartment, the Court made these observations about the Acosta case:
"However, there is one very significant difference between the Acosta case and this one. In the Acosta case, the defective walls were those of the apartment in which the child lived with her parents (defendant's tenants) and, of course, her presence there was known and expected. The landlord had the duty to keep the interior walls of the apartment in proper repair under the New York Multiple Dwelling Law and the court found the existing condition was in violation of that law. In this case, the defective condition was in a common hallway and it is not alleged that such small children as plaintiff were ever in the hallway alone or allowed to play there or that defendant had any notice of the presence of such small children there or any reason to expect them to be in the hallway without an older person in charge.

* * * * * *
"Therefore, while defendant had a duty to his tenants and members of their families to repair the condition shown, to prevent injury from external contact with falling or fallen plaster, the decisive question here is: Under the facts alleged, did defendant have the duty to plaintiff to prevent, by repairs or removal of the plaster, the kind of injury plaintiff sustained?

* * * * * *
"The Restatement of Torts, as to legal cause, says in Sec. 431: `The actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a substantial factor in bring about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm.' As to foreseeability, the Restatement in Sec. 435 says: (1) `If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent *916 him from being liable.' See Phillips v. Stockman, Mo.App., 351 S.W.2d 464, 474 and cases cited; Tharp v. Monsees, Mo.Sup., 327 S.W.2d 889, 894.
"In 1948, the following was added to Sec. 435: `(2) The actor's conduct is not a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm.' (Restatement 1948 Supplement, p. 736.) Comment d, concerning this added provision states: `A result of the actor's tortious conduct may be one which, either in its extent or the manner in which or the sequence of events through which the conduct operates to bring about the harm, is altogether different from the result which the actor at the time of his negligence recognized or should have recognized as likely to result therefrom. None the less, after the event, such a result may not appear to the court to be so highly extraordinary as to prevent the actor's conduct from being considered a legal cause of it. What the actor does or should expect depends upon the circumstances which he knows or should know and his forecast in the light of these circumstances as to what is likely to happen. The court's judgment, as to whether the harm is a normal or highly extraordinary result, is made after the event with the full knowledge of all that has happened.' Comment e. is: `It is impossible to state any definite rules by which it can be determined that a particular result of the actor's negligent conduct is so highly extraordinary as to prevent the conduct from being a legal cause of that result. This is a matter for the judgment of the court formulated after the event, and therefore, with the knowledge of the effect that was produced.' See also 2 Law of Torts, Harper and James, 1134-1151, Sec. 20.5.
"Looking back from the harm to plaintiff to defendant's negligent conduct, our view is that the result (plaintiff being in the hallway and sustaining injury by putting fallen plaster in her mouth) does appear to be so highly extraordinary, under the facts alleged, as to prevent defendant's conduct from being considered the legal cause of it, when there is nothing in the petition to show that defendant knew or had any reason to expect that such small children would be in the hallway unattended. We, therefore, hold the trial court reached the correct result in dismissing plaintiff's petition."
Again we note the important distinction made in this case as to the place the injury occurred, as was made in Montgomery v. Cantelli, supra, that is the children in both situations ate the paint and plaster which had flaked or fallen outside of the leased premises itself. We can see how it would be unreasonable to hold a landlord for the actions of children in eating such foreign material in those situations; however it does not seem unreasonable to place a greater burden upon him to keep this condition from occurring within the premises itself when it is known that small children will thereby be constantly exposed to the temptation of eating this fallen material.
We hold therefore that in such a situation as we have here the petition filed on behalf of the minor children, Charles and Jerry Davis, has stated a cause of action and we must turn therefore to a consideration of the sufficiency of the evidence presented to jury, to ascertain if they were correct in returning a judgment for the children.
Appellants contend that the evidence in the record before us is insufficient to prove that any alleged negligence on the part of Mr. Philips was the proximate cause of the injuries to the young Davis children. We find after a careful review of all the evidence, that we cannot agree with this contention.
Pauline Davis testified that she moved into defendant's apartment house in December, 1963. She lived in a front apartment *917 there for about a month when she decided to move to the rear unit in the same building where the incident in question occurred. After moving into this apartment she noticed that the paint was beginning to flake off and fall from the ceilings and walls.
She testified as follows on direct examination:
"Q. Was there any paint coming off the ceilings or walls of the place you were living?
"A. Yes, there was.
"Q. What did you do when you saw this paint or noticed it on the floor?
"A. Well, I would sweep it up.
"Q. When you were not present who was present with the children?
"A. Uh, Mrs. Davis was.
"Q. That's your mother-in-law?
"A. Yes.
"Q. Did you, while you were living in this apartment for some five months, ever see your children with paint in their hands?
"A. Yes, I did.
"Q. What did you do?
"A. I would spank them and correct them.
"Q. Did you see any in their month?
"A. Yes, several times.
"Q. What did you do then?
"A. I would try to take it out of their mouths.
"Q. Did you ever notify the landlord of this condition?
"A. I notified the lady that attended to the house.
"Q. Do you recall, Mrs. Davis, if you can it's a long time ago, the name of that lady?
"A. Her name is Catherine La Fleur, or something like that.
"Q. Did she live on the premises?
"A. Yes, she did.
"Q. Did you make complaints to her about the condition of your apartment?
"A. Yes, I did, several times.
"Q. Did you ask her to do something about it?
"A. Yes, she said she would.
"Q. Was anything done while you were living there?
"A. No, it wasn't.
"Q. You never did speak to Mr. Philips himself, did you, about this matter?
"A. No, sir, he left Catherine attend after the house."
Plaintiff's expert witnesses testified that they tested several samples of paint flakes taken from the inside of the apartment in question. Two of these samples taken from the bedroom walls and ceilings showed negligible traces of lead; however a third sample taken from the kitchen ceiling revealed a lead content of 10.55% in one layer of paint on the ceiling.
Further plaintiff introduced photographs taken of the kitchen ceiling which showed a considerable amount of paint flaking from the ceiling.
Plaintiff's medical witnesses diagnosed the children's condition as lead poisoning, on the basis of the blood tests and x-rays taken in the hospital.
Dr. Pierre Espenan, the children's treating physician stated:
BY MR. MANNING:
"Q. Based upon the examination, blood test, x-rays and diagnosis, could you with reasonable medical certainty tell us what caused Charles' condition?
"A. Yes, he had to get lead into his system over approximately a six or *918 eight-month period and the most likely way from the history that the parents afforded us was eating lead."
We find that the above evidence was sufficient for the jury to determine that the Davis children had contracted lead poisoning from ingesting paint flakes over a period of almost five months, which originated from the inside of the defendant's premises. Certainly given this evidence we are not in a position to reverse the decision of the jury on a factual basis.
Defendants contend that the flaking paint condition was never reported to Mr. Philips, the owner of the apartment. They argue that he was a good landlord who always kept a close watch on this rented premises. Philips presented the testimony of his handyman who stated that he had painted these premises on numerous occasions whenever they were in need of it.
We note however that the lady identified by Pauline Davis as the manager of the particular apartment, Catherine La Fleur, was not called upon to testify by the defendants to contradict Mrs. Davis' contention that she had complained several times about the flaking paint. Without considering the presumption which arises from the defendant's failure to offer her testimony, we must note that this leaves Mrs. Davis' testimony uncontroverted on this point.
Thus while Mr. Philips denied any direct personal knowledge as to the proven condition of his apartment, the plaintiff has successfully proven that he had constructive knowledge through his own apartment manager.
In recognizing the cause of action as alleged herein, and in affirming a judgment against the defendants, we are not unmindful of the danger that our decision will be used as a basis for suits against landlords for any and all injuries which are sustained on their premises. We can only state that landlords are not the insurers of the safety of their tenants. Only when a tenant is injured by an accident which occurred from the landlord owner's neglect to maintain the building in a safe and livable condition, or from a vice or defect of original construction, provided the injury does not result from a defective condition which the tenant himself did not have the obligation to keep in repair, will the owner-landlord be subject to liability.
The question has been raised in our minds about the actions of Pauline Davis herself in this matter, since after all it is admitted and indeed alleged by her that her small children ate paint flakes many times over a four or five month period. Indeed it could be argued that while the children themselves could not be guilty of contributory negligence, nevertheless Pauline Davis herself as their mother and guardian was negligent in not keeping a proper watch over her children, and it was her negligence which was the cause of their injuries. We realize that the contributory negligence of the parent cannot be imputed to the minors so as to defeat their recovery. Kliebert v. Marquette Casualty Company, La.App., 119 So.2d 545; however we can envision a situation where it is the superceding negligence of the parent in failing to keep a proper lookout for the child's wellbeing which is the actual proximate cause of the child's injury.
In any event we are satisfied that such was not the case herein. Pauline Davis testified as seen above that each time she noticed her children eating the paint flakes she stopped them from doing so by spanking their hands and instructing them not to do so again. Naturally being small children they persisted whenever her back was turned. Further she stated that whenever she noticed paint flakes on the floor she swept them up. She complained to the apartment manager on several occasions and even asked if she could buy paint herself and correct the condition. The record establishes she was a woman of meager means and education, yet she did everything she could to prevent the situation *919 from continuing except moving from the apartment, which we must assume she would have done had she been aware of the serious nature of the consequences to her children. Unfortunately for them, however, the lead poisoning was not evident to their own doctor until the damage had been done, and it was then that the Davis family moved from the premises.
We turn now to a consideration of the defendants' peremptory exceptions of no right of action, or interest to sue, and of prescription which were filed during the trial of this matter below. The record reveals that the original petition in this suit was filed on May 5, 1965 by Charles A. Davis, Sr. on behalf of his minor children. On January 16, 1967 on motion of Charles A. Davis, Sr., Pauline Green Davis, the mother of the children, was ordered substituted as party plaintiff in these proceedings. Further on that date Pauline Green Davis filed an application in the record wherein she prayed for and was granted the appointment as provisional tutor of her minor children. She alleged that she was the natural mother of these children and Charles A. Davis, Sr., who was the natural father, had never qualified as their tutor. Then during the trial, Pauline Davis testified that she had never been married, that the children were in fact the illegitimate issue of her common-law union with Charles A. Davis, Sr. The defendants subsequently filed the peremptory exceptions of no right of action and prescription referred to above, but they were overruled by the trial judge.
The thrust of defendants exceptions is directed to the fact that Charles A. Davis, Sr., in his individual capacity for and in behalf of the minor children was never the proper party to bring this suit, thus had no right of action or interest to sue. Further the petition filed by him on May 5, 1965 could therefore not have the effect of interrupting prescription, and Pauline Green Davis' action in substituting herself a party plaintiff in her capacity as natural tutrix came too late as the suit was then prescribed.
We will deal first with defendants exception of no right of action. Apparently defendants have confused the peremptory exception of no right of action or interest in plaintiff to sue, under LSA-C.C.P. art. 927, with the dilatory exception of lack of procedural capacity under LSA-C.C.P. art. 926.
In Jefferson v. Jefferson, La., 246 La. 1, 163 So.2d 74, Justice Sanders quoted at length from an article by the late Dean Henry G. McMahon in Tulane Law Review on this subject as follows:
"`* * * [The] exception of want of capacity is deemed the proper and only medium of putting the authority of the plaintiff at issue whenever he appears in a representative capacity, whether as mandatory, tutor, (or for the "`use and benefit'" of a minor without qualifying as tutor and without facts showing that plaintiff is the administrator of the estate of such minor), curator, administrator, executor, receiver, liquidator, or syndic. This exception appears to be the proper method of putting the procedural capacity of the plaintiff at issue where he appears in an individual capacity, whenever it is contended that for any reason the plaintiff is not sui juris.'"
* * * * * *
Unquestionably Charles A. Davis, Sr. as the natural father of the minor children was not the proper party in his individual capacity to bring this suit. A dilatory exception raised any time before answer would certainly have been maintained and either he or Pauline Green Davis would have been required to qualify as tutor before continuing with the action.
However the exception was not raised until after answer, and until after Pauline Green Davis had cured the procedural defect by qualifying herself as provisional tutrix and substituting herself as the party plaintiff in this capacity for *920 and on behalf of her minor children. Hence for both reasons the exception of lack or procedural capacity, the only one ever proper in this situation, was filed too late and had become for all purposes moot.
We are left however with the more difficult problem of prescription. This exception was filed on the last day of trial of the case. Stated simply, the question becomes: did the action of Charles A. Davis, Sr. in filing his petition admittedly without the procedural capacity to do so, have the effect of interrupting and suspending the tolling of prescription in this case? We find we must answer that question in the affirmative.
In Nettles v. Great American Insurance Company, 155 So.2d 87, La.App. 1 Cir. 1963, (Writ denied) an analogous situation was presented to the Court. In that case a father filed suit on behalf of his son for personal injuries suffered by his son in an automobile accident. The petition was filed however after the son became twenty-one years of age, subsequently the defendant filed the peremptory exception of no right of action on the basis that the son was a competent major at the time of the filing of the suit and he was the only party who had a right of pursue the case.
The exception was maintained but the son was given 15 days within which to substitute himself as party plaintiff. This was done; however, by then the one year prescriptive period had elapsed from the date of the accident.
The defendant then filed a plea of prescription alleging that as the father was without procedural or representative capacity to bring suit on behalf of his major son, the filing of the suit by the father did not serve to interrupt prescription, and the suit had thus prescribed by the time the son substituted himself as proper party plaintiff more than one year after the accident.
In deciding that the suit by the father for his son did interrupt prescription even though the father was without the procedural capacity to bring the suit, the Court cited with approval and quoted from the cases of Ray v. Liberty Industrial Life Insurance Company, La.App., 180 So. 855, 856 as follows:
"`In 9 Tulane Law Review, page 286, in an article entitled "PrescriptionInterruption" appears the following: "* * * Numerous cases have held that although there is some mistake as to the parties plaintiff, nevertheless the suit will interrupt prescription. Blanc v. Dupre, 36 La.Ann. 847, supra (suit by curator of succession whose appointment was null); Flower v. O'Connor, 1841, 17 La. 213 (suit by surviving partner of a firm who was non-suited because of lack of authority to represent the others); Becnel v. Waguespack, 1888, 40 La.Ann. 109, 3 So. 536 (suit by one co-owner for damage by trespass); Wolf & Sons v. New Orleans Tailor-Made Pants Co., 1903, 110 La. 427, 34 So. 590 (suit by individuals in their own names for tort to commercial partnership). This is in line with the French jurisprudence, in that the plaintiff need not have the capacity to sue in order to interrupt prescription. Hue, Commentaire du Code Civil XIV (1902) No. 386, p. 488; Baudry-Lacantinerie et Tissier, op. cit. supra No. 484, p. 369.'"
and Andrepont v. Ochsner, La.App., 84 So. 2d 63, 67:
"Our courts have adopted a liberal attitude free from the fatalities of technicalities in cases involving analogous situations. Where a defendant is sued in a representative capacity, such as receiver of an insolvent corporation, or administrator of a succession, and is later sued in his individual capacity on the same cause of action, the first suit has been held to interrupt prescription running on the demand. Succession of Saunders, 37 La.Ann. 769; Vernon v. *921 Illinois Cent. R. Co., 154 La. 370, 97 So. 493; Anding v. Texas & P. Ry. Co., 158 La. 412, 104 So. 190; Warn v. Mexican Petroleum Corporation, 6 La.App. 55; Calamia v. Mayer, La.App., 174 So. 668. It makes no difference that the plaintiff has no right to bring the action. Flower v. O'Connor, 17 La. 213; Bell v. Mix, 1 Rob. 393; Blanc v. Dupre, 36 La. Ann. 847; Becnel v. Waguespack, 40 La.Ann. 109, 3 So. 536; Boyd v. Heine, 41 La.Ann. 393, 6 So. 714; Wolf & Sons v. New Orleans Tailor-made Pants Co., 110 La. 427, 34 So. 590; Ray v. Liberty Industrial Life Ins. Co., La.App., 180 So. 855.' (Emphasis added)"
Following the rationale of these quoted cases then, and of the Nettles case itself we are of the opinion that the filing of this suit by Charles A. Davis, Sr. for and in behalf of his minor children, did serve to interrupt prescription in this case, even though he was without the procedural capacity to bring this suit.
Having disposed then of the exceptions filed in this matter and having decided that the judgment is correct as to the issue of liability, we turn finally to the issue of quantum raised by appellants herein. Judgment was rendered in favor of Pauline Green Davis as provisional tutrix for and on behalf of her minor child, Charles Davis, Jr. in the amount of $115,000.00 to be prorated as follows: $50,000.00 against Louis C. Philips and Globe Indemnity Company, jointly and in solido; and $65,000.00 against Louis C. Philips individually. Additionally judgment was rendered in favor of Pauline Green Davis, as provisional tutrix for and on behalf of her minor child Jerry Davis in the amount of $2,500.00 against Louis C. Philips and Globe Indemnity Company, jointly and in solido.
Defendant-appellants contend that the amount awarded in behalf of the minor child Charles Davis was grossly excessive and should be reduced to the sum of $35,000.00. They argue that this $115,000.00 award was based largely on speculative, vague and conjectural testimony by plaintiff's expert witnesses as to the amount of future loss of earnings by the child.
We agree that to support a special award in damages for loss of future wages, probabilities, surmises, speculations and conjectures cannot be accepted as sufficient grounds to justify recovery. However we note that no such special award was given in this case. Further we find that an award of $115,000.00 in favor of the minor child, Charles A. Davis, Jr., was not excessive for his pain, suffering and total disability in view of the terrible injuries which he has suffered.
Several medical witnesses testified as to the nature of the crippling injuries to the child, and the effect these injuries will have on his future life and development. Without going into great detail into these injuries, suffice it to say that prior to their occurrence Charles A. Davis, Jr. was in all respects an average three year old child. He was able to play and converse with his family and friends and could look forward to a full and healthy life as a normal and complete human being. As, a result of this occurrence he will forever mentally remain a child of three years old. In fact he has regressed in his personality to the extent that he cannot speak and no longer is toilet trained. The prognosis for improvement is extremely doubtful to the extent that it is a medical improbability that he will ever master his basic bodily functions; certainly will never be educable and probably will never be trainable in even a simple work skill. Under these circumstances we will not disturb the award of $115,000.00 which on its face may appear high, for even this amount could not begin to compensate the child for his loss.
For the reasons hereinabove set forth the judgment appealed from is affirmed in all respects, appellants to pay the costs of this appeal.
Affirmed.