242 So.2d 839

Charles DAVIS, Individually and on Behalf
of his Minor Children, Charles Davis,
Jr., and Jerry Davis

v.

ROYAL–GLOBE INSURANCE COMPANIES
and Louis C. Philips.

No. 50055.

June 29, 1970.

Rehearing Denied Jan. 22, 1971.

Richards & Hoepffner, Charles E. Richards, Bernard, Micholet & Cassisa, Paul V. Cassisa, New Orleans, for defendants-appellants.

Stringer & Manning, James O. Manning, New Orleans, for plaintiff-appellee.

SUMMERS, Justice.

Originally this suit was instituted by Charles Davis, as the father of the minors Charles Davis, Jr., and Jerry Davis, claiming damages individually and on behalf of the minors. When it was revealed that Charles Davis was only the natural father of the children, the pleadings were amended to substitute Pauline Green Davis, their mother, who qualified as their provisional tutrix.

Pauline Green Davis was estranged from the father of the children and came with Charles Davis' mother to New Orleans from Memphis, Tennessee, in June 1963. She rented a furnished apartment on the corner of Baronne and Felicity and secured employment as a waitress at the Walgreen Drug Store located at the corner of St. Charles and Napoleon Avenues. While she worked, the 65-year-old grandmother cared for the children. Charles, Jr., was then 2½ years of age, and Jerry was a year younger.

In December of 1963, Pauline moved her family to 4309-11 Prytania Street, where, for $15 per week, she rented a front apartment in an eight-apartment building owned by the defendant Louis C. Philips. This new location was closer to her work and away from boisterous neighbors who disturbed her peace and tranquility at Baronne and Felicity. Because her rent payments were tardy; and apparently because she was having a hard time making them, the apartment manager Catherine Lafleur suggested she take a rear apartment in the same building at a reduced rental of $12

a week. This move was accomplished about one month after moving to the Prytania Street address. Pauline, with the grandmother and children, occupied the rear apartment, consisting of a bedroom, kitchen and bath, until the latter part of May 1964 when an eviction notice was served upon her for nonpayment of rent. We gather from the record that she returned to Memphis soon thereafter.

Prior to her departure, however, on May 9, 1964 the child Charles, then 3½ years of age, was taken to Touro Infirmary with a complaint that he had been vomiting about five days. He was seen by Dr. Ewin who prescribed amytal to settle his stomach. The doctor observed bruises and stripes on the child's buttock, which, in his opinion, resulted from a spanking with a belt.

On May 11 the child was seen by Dr. Espanen, who had been the family physician since September 1963. On May 14, Charles was again returned to the hospital, this time with convulsions. He receded into a coma and was hospitalized in the intensive care ward. His condition was diagnosed as lead poisoning. Although formerly normal, a permanent injury to the brain has resulted from the lead poisoning; and expert testimony establishes that Charles will remain retarded for the remainder of his life, and, in all probability, will require permanent institutional confinement and care after he reaches the age of puberty.

The child Jerry was brought to the hospital on May 15, 1964, examined and found to have a mild case of lead poisoning. He was treated for this condition and released shortly thereafter with no residual effects.

This suit for damages was instituted on May 5, 1965 against the landlord Louis C. Philips and his liability insurer Globe Indemnity Company, erroneously referred to as Royal-Globe Indemnity Companies by plaintiffs. The claim is based upon the theory that the landlord negligently permitted paint containing lead on the ceilings of the apartment to peel, flake and fall to the floor where the flakes were eaten by the children. Lead poisoning and the resulting injury, it is claimed, resulted from ingestion of the paint flakes.

Exceptions of no cause of action and prescription filed by defendants were overruled by the trial court. In a trial by jury, defendants were condemned to pay $115,-000 as damages for the injuries to the child Charles Davis, Jr., prorated $50,000 against Globe Indemnity Company, the limit of its policy coverage, and $65,000 against the defendant Louis C. Philips. The sum of $2,500 was assessed against the defendants in solido as damages incurred by the child Jerry Davis. On appeal to the Fourth Circuit, the judgment was affirmed. 223 So.2d 912. Certiorari was granted on application of the defendants to reconcile what we believed to be a conflict between this case and the decision of the

Fourth Circuit in Montgomery v. Cantelli, 174 So.2d 238 (1965). Since the record is now before us, we find the determination of fact supporting the judgment to be manifestly erroneous, and we reverse. Because we have taken this view of the matter, we need not decide the issues raised by the exceptions.

Plaintiffs' counsel urges us to impose liability upon the owner of the apartment building without reference to fault under the terms of Article 2322 of the Civil Code which provides:

> The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction.

▬ The "ruin" contemplated by this Article has reference to the actual fall or collapse of a building or one of its components. This is the attitude in the French law and it is a view expressed in Guidry v. Hamlin, 188 So. 662, 664 (La.App. Orl.1939), where the Article was said to have "no reference to any situation except that in which some part of the building collapses, or breaks, or gives way." See Montgomery v. Cantelli, 174 So.2d 238 (La.App.1965). And to satisfy the meaning of "ruin" as used in Article 2322 the

fall or collapse must involve a more or less substantial component of the structure. The English text of the Louisiana Code of 1808 translates *ruine* as "falling down". Comment, 42 Tul.L.Rev. 178, 184 (1967). Article 2322 is considered a reiteration of the principle that the building must "fall" expressed in Article 670 of the Civil Code, except that it permits recovery by third persons lawfully on the premises, whereas Article 670 limits the owner's responsibility to neighbors and passers-by.[1]

▬ Falling paint flakes from an apartment ceiling were never intended by this article to be considered the "ruin" of a building, which would impose the unduly harsh burden of absolute liability upon the owner. Where it is alleged, as here, that the injury is to a third person lawfully on the premises from a dangerous condition which the lessor has permitted to exist, then the appropriate basis for the decision is Articles 2315 and 2316. Comment, 39 Tul.L.Rev. 798, 837 (1965); Comment, 16 Tul.L.Rev. 448, 449 (1942); Comment, 7 La.L.Rev. 406 (1947).

Apparently the only persons present in the apartment who could testify that the children ate paint flakes from the ceiling were the mother and grandmother. Only

1. La.Civil Code Art. 670 provides: "Every one is bound to keep his buildings in repair, so that neither their fall, nor that of any part of the materials composing them, may injure the neighbors or passengers, under the penalty of all losses and damages, which may result from the neglect of the owner in that respect."

the mother testified, and the grandmother's failure to testify is not explained. Proof of this fact, therefore, depends almost entirely upon the mother's testimony and the additional fact that an opaque fleck appeared on an X ray of Jerry's lower stomach taken when he was brought to the hospital on May 15, 1964. In the opinion of the doctors who testified, this opaque fleck could be a foreign particle in the X ray developing fluid or a paint flake with plaster adhering to it. However, the child's feces were not examined to verify the supposition that the flake was paint.

Pauline's testimony is to the effect that, about three months after she moved into the back apartment, "just all of a sudden" she noticed paint flakes on the floor in the bedroom. Thereafter, on several occasions, she saw the children with paint flakes in their hands or mouths. When she saw this, she removed these objects from their mouths. She testified, also, that she notified the resident manager Catherine Lafleur that the paint was peeling and falling from the ceilings of the apartment, but nothing was done to correct the condition. Catherine Lafleur was not called to testify, and her failure to do so remains unexplained by either plaintiffs or defendants. The weight of Pauline's testimony would have been considerably enhanced by corroboration on this point.

Although at the trial Pauline insisted that the paint fell from the ceiling, on May 14, 1964 when Charles, Jr., was brought to the hospital in convulsions, and the treating physician Dr. Espanen asked her what the child could have been eating to cause his stomach pains, she replied that it could possibly be plaster or paint flakes; and when he asked her to bring in samples of the paint, she brought him samples from the walls of the apartment.

As already noted, a month after Pauline Davis moved with her children and their grandmother to the Prytania Street address, they moved into the rear apartment. They had occupied the front apartment for a month, but there is no claim or testimony that the paint was peeling and falling to the floor in that apartment. This would mean that she occupied the rear apartment where the paint is alleged to have fallen from the ceiling beginning about January 30, 1964. It was three months after this before she noticed paint flakes falling to the floor, which would mean that it was the end of April before there was any probability that the children began eating them, barely two weeks before Charles, Jr., went to the hospital with convulsions on May 14, 1964.

In addition to Pauline's testimony as to when the paint eating started, the family physician who ordinarily treated the children testified that the child Charles, Jr., was seen by him in September 1963, during December 1963, and on May 11, 1964 at which times the diagnosis was tonsillitis,

gastroenteritis and milk anemia, the latter two conditions being symptoms associated with lead poisoning. Still, at no time during these examinations did the mother or grandmother report paint eating by the children. And, as this testimony discloses, the symptons existed before the children moved into the defendant Philips' apartment.

The May 11 examination by Dr. Espenan followed the May 9 visit already mentioned when Dr. Ewin saw Charles Jr., and prescribed for the stomach disorder. On neither of these occasions did the mother give a history of paint eating. It was only when Dr. Espenan asked her about the ingestion of foreign materials on May 14 that she stated Charles had eaten large quantities of material from his room, which had fallen into his crib from the wall. Later the mother admitted she had no crib, but a rollaway bed kept in the bedroom, and, as already noted, at the trial she testified the paint flakes fell from the ceiling.

From the foregoing, it is indicated that the children could not have eaten paint from the apartment in question for much more than two weeks, allowing for discrepancies in time estimates in Pauline Davis' testimony. Medical testimony, however, establishes that the ingestion of paint flakes under the circumstances outlined here would have to take place, according to Dr. Espanen the treating physician, over a period of six to eight months. Dr. Chetta, the Orleans Parish Coroner, whose qualifications in toxology and whose experience with lead poisoning are particularly impressive, was of the opinion that the ingestion of lead in this manner would have to extend over a period of eight months to one year in order to bring on the acute condition Charles, Jr., experienced.

Only the testimony of Dr. Kern, who treated Charles, Jr., after the convulsions, seems to be to the contrary. He appeared to be of the opinion that the lead poisoning was consistent with a history indicating that the child had been eating paint flakes for five or six weeks. We are inclined to believe, however, that there may have been some inadvertent discrepancy in the history he refers to in his testimony and the history upon which his opinion was based. In any event, because of these inconsistent opinions of the doctors, we accept Dr. Chetta's and Dr. Espanen's opinions, which, if combined, would require the consumption of paint flakes over a period of from six to twelve months before the acute condition suffered by Charles could occur.

Paint samples were requested by the doctors in an effort to determine the cause of the lead poisoning. First Pauline was asked by Dr. Espenan to bring in samples. The samples she produced were scraped from the *bedroom* wall shortly after May 13 and tested negative for lead. Thereafter, in November 1964, plaintiffs had sam-

ples from the *bedroom* ceiling and walls tested again, and again no lead was found. Then, on January 11, 1967, two months before the trial and almost three years after the diagnosis of lead poisoning in May 1964, plaintiffs employed an investigator who obtained samples from the ceiling of the *kitchen* which revealed a lead content. In the paint sample thus obtained, there were five layers of pink paint, none of which contained lead; but under these were seven layers of green paint containing 10.55 percent lead.

Philips the landlord acquired the property in question in 1948. He is a practicing attorney and did not ordinarily manage this or his other properties in person. He produced as witnesses his son who helped to manage his apartments and Newman Jones who repaired the apartment in question and other apartments owned by Philips. Jones described in detail his practice over a period of many years of cleaning the apartments for Philips whenever occupancy changed. The procedure was to clean the plaster walls, scrape all loose plaster and paint, repair damaged areas, sandpaper and then repaint the room in whole or in part with a nonlead paint. It was an invariable practice never to use lead paint inside the building. Lead paint had never been used in the apartment since it was acquired by Philips. A hardware dealer, from whom all materials had been purchased for many years for use on the Philips properties, verified this fact.

Although plaintiff's son, who collected rents, testified that it was not unusual for paint to peel from the plastered walls of old structures in New Orleans built like the one occupied by Pauline, he had no recollection of any unusual condition in the apartment she occupied.

A photograph of the kitchen ceiling taken on November 11, 1964 does not depict it to be in a deteriorated or neglected condition. It appears to be in the condition which could be expected of a furnished apartment which rents for $12 per week.

Based upon the evidence in the record, we cannot agree that plaintiffs have succeeded in discharging the burden of proof by a preponderance of the evidence to a legal certainty that defendant Philips breached the standard of care owed by a landlord to the child of his tenant. Thus we are unable to find that he was negligent in maintaining the premises. Moreover, we are not satisfied that enough paint flakes fell to create a dangerous condition in the apartment. Nor do we find that lead paint from the Philips apartment was eaten by the children for a sufficient length of time or in sufficient quantities to cause the lead poisoning they suffered.

The judgment is reversed, and the suit is dismissed at plaintiffs' cost.