285 So.2d 577 (1973)
Thomas SMOLINSKI, Sr., Individually and as Administrator of the Estate of his minor son, Thomas Smolinski, Jr.
v.
Saverio TAULLI.
No. 4640.
Court of Appeal of Louisiana, Fourth Circuit.
November 2, 1973.
Rehearing Denied December 10, 1973.
Writ Refused February 1, 1974.
Michael Osborne, of Dufour, Levy, Marx, Lucas & Osborne, New Orleans, for Thomas Smolinski, Sr., plaintiff-appellant.
Nelson & Nelson, J. Thomas Nelson, Charles C. Garretson and Michael A. Dessommes, New Orleans, for Saverio Taulli, defendant-appellee.
Before LEMMON, GULOTTA and BOUTALL, JJ.
BOUTALL, Judge.
This is a suit brought by a child's father to recover medical expenses on his own behalf and general damages for the injured child. The trial court dismissed plaintiff's suit, and we affirmed. 259 So.2d 378 (1972). The Supreme Court granted certiorari, 261 La. 772, 260 So.2d 700 (1972), to review our holding that the maintenance of these premise conditions did not result *578 in liability of the owner-landlord for a small child injured because of them. The judgment of this court was reversed on the issue of liability, and the case was remanded to us in order that we may fix the damages to which the plaintiff is entitled and to render judgment for such sums against the defendant. La., 276 So.2d 786 (March 26, 1973).
The facts are as follows: Thomas Smolinski, Jr., born December 1, 1965, was approximately nineteen months old on September 20, 1967, when he fell from a landing at the top of a stairway leading to a second floor apartment. He was discovered on the ground beneath the landing by a relative who stated that he was "out cold" but that his eyes were open, and who immediately called Thomas's mother. His mother immediately came downstairs and noted that he was obviously injured, and testifies that he was as if drowsy, and that blood was coming from one side of his nose. Both of these ladies stated that he soon began vomiting blood as they began to take him to a hospital. The child was rushed to the Algiers General Hospital, where it was discovered that it was necessary to obtain an examination by Dr. Joseph Gregoratti before he could be admitted. He was then taken to Dr. Gregoratti's office, where Dr. Gregoratti examined him, took some X-rays, and arranged to have him immediately admitted to the hospital. The child remained in the hospital for four days, and was attended by Dr. Gregoratti and Dr. D. E. Richardson, a neurological surgeon. Dr. Gregoratti did not testify because of an emergency which he was attending on trial date.
Dr. Richardson testified that, at the time he saw the child, the child was conscious although he was still obviously ill with nausea and vomiting and he was somewhat lethargic but other than that he was intact. The X-rays disclosed a closed linear parietal skull fracture. He concluded at that time the child obviously had a concussion of the brain which by his definition was a temporary loss of consciousness and did not involve any permanent damage to the brain. After several visits to the hospital, he thought the child had recovered and was up and about, so the child was discharged from the hospital.
Dr. Richardson next saw the child in his office on July 5, 1968 some ten months later. The child was brought back to him because of changes in personality. The doctor was told that the child was uncontrollable at times and that his mother was having difficulty in toilet training him. Additionally the child was not talking as well as he should, nor was he able to walk or run as well as he should. He had difficulty getting along with other children and was very restless and overactive. Upon examination the doctor discovered that he was indeed hyperkinetic, that, is overactive, and he had very poor speech, a short attention span. The child was in such condition that the doctor was unable to obtain the cooperation necessary to give him a thorough examination to discover what the problems may be. Dr. Richardson felt that it was rather obvious that the child had brain damage because of his hyperkinesia or hyperactivity and that he was retarded in psychomotor development. He explained that the child was so extremely active that he could not stay still but must continually move about, that the child was not talking well at all, and was obviously having difficulties carrying out the things the doctor wished him to do.
In order to reexamine him thoroughly, the doctor felt that he would have to put him on a tranquilizer in order to arrest the hyperactivity. He was seen again on July 19, 1968, but his condition was relatively the same, except that he had developed a rash to the medicine (Valium) that had been prescribed. The medicine was changed to Thorozene to see what effect that tranquilizer may have. On September 20, 1968, Dr. Richardson again saw the child and stated that it was fairly obvious that the Thorozene was not doing anything for the child and so he could only change the medicine to another type of tranquilizer *579 called Adererac. On October 23, 1968 the doctor saw the child again and was informed that he was tolerating his medicine and had gotten better. He had noted that the child seemed calmer and his mother stated that he was starting to talk some and was eating better and was able to get along with other children in the family much better. The doctor noted that the child was much less overactive than he had been. Because of this improvement the doctor simply increased his medicine and asked that he come back again.
The child returned again on December 4, 1968 at which time the doctor stated he was still doing fairly well but was still overactive and poorly cooperative, but that he was better than he had been. At this time he thought that the child had slowed down enough so that definitive results may be obtained from certain tests, and referred the child to Dr. Sybil A. Stone, a clinical Psychologist.
Dr. Stone saw the child on December 16, 1968 at Dr. Richardson's request, and tested the child using the Merrill Palmer preschool scale, which is a test for children between the ages of two and five years. She had some difficulty administering the test because of the child's personality, but the results were such that the child ranked below average in the 13th percentile of children his age. The indication of this test is for any 100 ordinary children selected at random, 87 would do better than he did, and 12 would not do as well. Dr. Stone testified that she did not think that the child was mentally defective but the test did indicate a dull or below average mentality which indicated that he would have difficulty in attending regular school instruction. It was noted above, because of the child's condition, she could not give a positive determination of all of his problems, and she felt that the child should be reexamined a year or so later, or certainly before he attempted school.
The child returned to Dr. Richardson on January 6, 1969, and Dr. Richardson felt that his condition was essentially unchanged, but that the medication should continue and that the child should be re-evaluated in a year or two to determine more accurately the extent of his difficulties. He stated that there was no question but that the child had brain damage, but at that time it could not be determined whether his mental capacity was sufficient to permit him to enter regular school or receive special schooling. As far as the record reflects, this was the last time the child was seen by a doctor.
From a consideration of the evidence which was presented to him during the course of treatment, Dr. Richardson was of the opinion that the child had suffered more than a concussion at the time of the injury, and had in fact suffered a contusion of the brain, and that permanent damage had been done. He stated that the child's abnormality is more in the integrated function of the brain rather than simply motor control, which may cause paralysis, in that the trouble lay in the child's ability to learn, to speak, to talk, ability to think and perform, and emotional behavior. He is certain that the child will experience difficulties in these areas on a permanent basis, but he is unable to tell to what extent the difficulties will occur, because of the difficulty of evaluation of so young a child with the disorder he has. There is no countervailing evidence, and we agree with his conclusions.
Based upon the foregoing facts, we are led to conclude that the child did suffer brain damage resulting in abnormalities in the integrated functions of the brain causing loss of ability to think and perform together with a change in his emotional behavior. We must rely upon the uncontradicted testimony of the expert witnesses who tell us that the injury is permanent, but they are unable to determine the extent of the damage. Under such circumstances we must weigh and consider all of the factors involved affecting the young child not only at the present time, but throughout his life expectancy. As stated in the case of Jordan v. Travelers Insurance *580 Company, 257 La. 995, 245 So.2d 151 (1971):
"Where there is legal right to recovery but the damages cannot be exactly estimated, the courts have reasonable discretion to assess same based upon all the facts and circumstances of the case. Civil Code Art. 1934(3); Brantley v. Tremont & Gulf Ry. Co., 226 La. 176, 75 So.2d 236 (1954) and decisions therein cited." 254 So.2d 155.
To assist us in our determination as to amount, we have referred to the following cases: Lefevre v. Allstate Insurance Company, 258 So.2d 397 (La.App. 4th Cir. 1972); Bourgeois v. State, Through Dept of Highways, 255 So.2d 861 (La.App. 4th Cir. 1971); Allen v. Aetna Life & Casualty Insurance Co., 254 So.2d 69 (La.App. 3rd Cir. 1971); Jordan v. Travelers Insurance Co., supra, affirming award for physical and mental pain and suffering set in Jordan v. Travelers Insurance Company, 231 So.2d 678 (La.App. 1st Cir. 1970); Davis v. Royal Globe Insurance Companies, 223 So.2d 912 (La.App. 4th Cir. 1969) reversed on other grounds, 257 La. 523, 242 So.2d 839 (1970); Debautte v. Southern Farm Bureau Casualty Insurance Co., 170 So.2d 234 (La.App. 4th Cir. 1964). The injuries in the present case, are not of course coincident with the injuries suffered in any of the above referred to cases, but we find them to be of assistance in arriving at our determination. We set the damages for the child's past, present and future injuries, disabilities and suffering at the sum of $75,000.00.
The father of the minor child sues for the special damages that he incurred, consisting of the following:

Tulane Clinic for Psychological
 Testing ......................... $25.00
Algiers General Hospital .......... 99.75
Oakview Medical Center, Dr.
 Gregoratti ...................... 108.00
Dr. Donald E. Richardson .......... 50.00
 _______
 TOTAL $282.75

In addition to these bills, it appears that there were some expenses which were incurred, but no proof offered. We refer especially to drug bills, and to future medical bills for further testing and evaluation of the minor child, which has been recommended by the doctors. However, even under the tests set out in Jordan v. Travelers Insurance Company, supra, we are unable to make a determination of these items, and plaintiff does not seek them in his brief. We thus conclude Mr. Smolinski is entitled to recover $282.75.
Considering the above facts and the mandate of the Louisiana Supreme Court, it is now ordered, adjudged and decreed that there is judgment herein in favor of plaintiff, Thomas Smolinski, Sr. against defendant, Saverio Taulli, in the sum of Two Hundred Eighty Two and 75/100 Dollars ($282.75) with legal interest thereon from date of judicial demand until paid, and there is judgment herein in favor of Thomas Smolinski, Sr. in his capacity as administrator of the estate of his minor son, and for and on behalf of his minor son, Thomas Smolinski, Jr., and against defendant Saverio Taulli in the sum of Seventy Five Thousand Dollars ($75,000.00) with legal interest from date of judicial demand until paid. Defendant, Saverio Taulli to pay all costs of the proceedings in all courts.
Judgment rendered.